765 A.2d 1024

**ALLSTATE LIFE INSURANCE COMPANY**

v.

**Maria Angelique FISTER, Personal Representative of the Estate of Mary Gaye Fister, et al.**

**No. 37, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Jan. 31, 2001.

Bryan D. Bolton (Michael R. McCann and Funk & Bolton, P.A. on the brief), Baltimore, for appellant.

Jeffrey L. Forman (Bruce E. Kauffman and Forman, P.A. on the brief), Baltimore, for appellees.

Argued before JAMES R. EYLER, SONNER and WILLIAM W. WENNER (Ret., specially assigned), JJ.

JAMES R. EYLER, Judge.

This is an appeal by Allstate Life Insurance Company, appellant, from a summary judgment entered by the Circuit Court for Frederick County in favor of Maria Angelique Fister, personal representative of the estate of Mary Gaye Fister (the Estate), and Dorothy Winslow, appellees, beneficiaries of certain life insurance policies insuring the life of the decedent. The policies excluded coverage for death by suicide. The circuit court ruled as a matter of law that the insured's death was not suicide and entered summary judgment in favor of appellees. We hold that the insured's death was suicide, and as a result, we shall reverse the judgment of the circuit court. Because the parties filed cross motions for summary judgment and our ruling is one of law, we direct the entry of judgment in favor of appellant.

## Factual Background

Appellant, between November, 1994 and May, 1995, issued five life insurance policies to Mary Gaye Fister as insured. Each policy contained a provision excluding death by suicide within a two-year contestable period. The insured died on September 10, 1996, within that two-year period. Appellant denied coverage on the ground that the insured's death was by suicide. The policies provided an aggregate death benefit of $1,650,000. One of the policies had a face amount of $1,000,000, with the Estate as beneficiary; another had a face amount of $100,000, with Dorothy Winslow, the insured's mother, as beneficiary; another had a face amount of $200,000,

with Lawrence H. Goldman and William Tad Cole as beneficiaries. The other two policies are not involved in this appeal.

The suicide exclusion clause, the same in each policy, provided as follows:

**Suicide**—If the insured dies by suicide while sane or insane within two years from the start date of the contract:

1. We will only pay a refund of the payments made; and
2. The contract will stop.

Appellant points to the following evidence. Ms. Fister, the insured, and Lawrence H. Goldman were extraordinarily close friends. Mr. Goldman was very loyal to Ms. Fister. She controlled him, and he frequently did her bidding. In September, 1995, Ms. Fister had breast augmentation surgery, and Mr. Goldman took care of her for approximately three months. On several occasions, in 1995 and 1996, Ms. Fister asked several persons to kill her, including Mr. Goldman and William Tad Cole, a former boyfriend.

During the three-month period prior to her death, Ms. Fister left home and incurred substantial debts while traveling. During that time period, Ms. Fister left several messages, conveying her intention to commit suicide. On August 30, 1996, she attempted suicide on two occasions. On September 7, 1996, Ms. Fister purchased a 12 gauge shotgun, the gun that ultimately killed her. On September 8, 1996, Ms. Fister met Mr. Goldman in New Jersey. Ms. Fister expressed her desire to die.

On September 10, 1996, Ms. Fister called Mr. Goldman and told him that this was the day she was going to die. Ms. Fister told Mr. Goldman to purchase string so that she could rig the shotgun and pull the trigger. He purchased string and, on September 10, 1996, met Ms. Fister at the Maryland House Restaurant on Interstate 95. The two of them then proceeded to Harper's Ferry, West Virginia, where Ms. Fister retrieved the shotgun from the car and rigged it for a test firing, which worked. Ms. Fister directed Mr. Goldman to a location in Monrovia, Maryland, near her mother's home. Ms. Fister loaded the shotgun and told Mr. Goldman to make the

shotgun disappear after she died. Ms. Fister sat down in the road and directed Mr. Goldman to place the string, which was attached to the shotgun, around his leg. Ms. Fister pulled back the shotgun's hammer and pulled the string several times, but the gun did not fire. She began screaming and said, "Larry, for the first time in your life, do the right thing." While Ms. Fister continued trying to pull on the string to fire the shotgun, Mr. Goldman pulled on the trigger. The gun discharged, and Ms. Fister died from the wound.

Appellant points to additional evidence relating to Ms. Fister's deteriorating financial condition (she owed over one million dollars and had few assets), her fraudulent conduct prior to death (she was the subject of lawsuits and a criminal fraud investigation), and her plans to stage her own death (she expressed a desire for her death to look like murder so that life insurance proceeds could pay debts). We find it unnecessary to detail those facts because appellees agree that Ms. Fister intended to kill herself. Appellees' position is that she was unsuccessful, and Mr. Goldman killed her.

Appellees filed a complaint against appellant in the Circuit Court for Frederick County, seeking death benefits under the three life insurance policies involved in this appeal. The beneficiaries of the other two policies, Anna P. Bussard and the A.P. Bussard Revocable Trust, were plaintiffs below, but they are not parties on appeal.

In the complaint, as amended, Lawrence H. Goldman and William Tad Cole were also named as defendants. On October 4, 1999, an order of default was entered against Messrs. Goldman and Cole. Mr. Goldman and Mr. Cole were beneficiaries of one of the policies—in the face amount of $200,000—and the Estate was contingent beneficiary. The Estate sought a declaratory judgment that the primary beneficiaries should be disqualified because of involvement in the insured's death.

Appellant and appellees filed cross motions for summary

judgment.[1]   The circuit court, on February 17, 2000, entered summary judgment (A) in favor of the Estate, (1) as beneficiary of the policy in the face amount of $1,000,000 plus (2) as contingent beneficiary of the policy in the face amount of $200,000 with Goldman and Cole as primary beneficiaries (a total of $1,446,378.08 including prejudgment interest) and (B) in favor of Dorothy Winslow, beneficiary of the policy in the face amount of $100,000 (a total of $120,531.51 including prejudgment interest).[2]

Appellant's position, below and on appeal, is that the insured's death was by suicide, if we look at it, as we must, from the insured's perspective.   According to appellant, the death was the result of a voluntary act, and the insured was responsible for the acts of her agent, Mr. Goldman.   Additionally, appellant contends that the slayer's rule precludes recovery.

█   The circuit court held that the term suicide was ambiguous, construed the provision against the insurer, and held that the insured's death was not suicide as a matter of law.[3]

---

1.   When the case was first filed, appellant removed it to the United States District Court for the District of Maryland.   The parties filed cross motions for summary judgment.   The District Court granted summary judgment in favor of Allstate.   On appeal, the United States Court of Appeals for the Fourth Circuit vacated the judgment on the ground that the district court lacked jurisdiction.

2.   The court also entered summary judgment in favor of Anna P. Bussard, beneficiary of the policy in the face amount of $200,000 (a total of $241,063.01 including prejudgment interest), and summary judgment in favor of appellant with respect to a policy in the face amount of $150,000 with A.P. Bussard Revocable Trust as beneficiary. As previously stated, those policies are not before us.

3.   The Estate, in one count of the second amended complaint, requested a declaratory judgment that Messrs. Goldman and Cole be disqualified as beneficiaries because of their undisputed involvement in the insured's death.   An order of default was entered against them.   Because of the request for a declaratory judgment, the court should have rendered a written opinion spelling out the rights of the parties.   See *Maryland Ass'n of HMO's v. Health Servs. Cost Review Comm'n*, 356 Md. 581, 603, 741 A.2d 483 (1999)(stating that the lower court committed error because it "filed no written declaratory judgment and filed no written opinion which could be treated as a declaratory judgment.");

## Discussion

The suicide exclusion clause in the policies was permitted by Md.Code (1986 Repl.Vol., 1990 Cum.Supp.), Article 48A, § 410, which provided as follows:

(a) No policy of life insurance shall be delivered or issued for delivery in this State if it contains a provision which excludes or restricts liability for death caused in a certain specified manner or occurring while the insured has a specified status, except that such a policy may contain provisions excluding or restricting coverage as specified therein in the event of death under any of the following circumstances:

. . .

(5) Death within 2 years from the date of issue of the policy as a result of suicide, while sane or insane.[4]

Appellant argues that the provision in question is not ambiguous. Relying upon *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 753 A.2d 533 (2000), appellant asserts that we must look at the issue from the perspective of the insured, employing both a subjective and an objective analysis. Appellant also

*Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 414, 687 A.2d 652 (1997) ("[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of ... judgment in favor of the prevailing party.")(quoting *Ashton v. Brown*, 339 Md. 70, 87, 660 A.2d 447 (1995)). Nevertheless, we regard the court's order of February 17, 2000 as sufficient to determine the rights of the parties before us on appeal because the order implicitly holds that Messrs. Goldman and Cole were disqualified as primary beneficiaries in favor of the Estate as contingent beneficiary.

There is yet another problem, however. There was no judgment entered against Messrs. Goldman and Cole. The docket is silent as to those individuals subsequent to the order of default. In addition to arguable noncompliance with the need for a written opinion in a declaratory judgment action, it is doubtful whether there is a final appealable judgment. We will exercise our discretion, however, pursuant to Rule 8–602(e), to enter a final judgment in favor of appellees against appellant.

4. Article 48A, section 410(a) has since been recodified without substantive change as section 16–215(b)(5) of the Insurance Article.

argues that suicide is death by voluntary act, relying on Supreme Court and Maryland cases. Appellant concludes that the insured voluntarily employed an agent to act on her behalf. Finally, and alternatively, appellant relies on the slayer's rule.

Appellees concede that the insured intended to kill herself, but posit that she attempted to kill herself and failed. They agree that "suicide" is not ambiguous, arguing that any doubt of ambiguity was removed in 1999, with the implementation of the Assisted Suicide Law. *See* Art. 27, § 416 (defining suicide as "the act or instance of intentionally taking one's own life."). Appellees argue that the insured did not take her own life; Mr. Goldman did.

According to Maryland law, the death of an insured covered by a life insurance policy is presumed to have been caused either by an accident or by natural causes. *Baltimore Life Ins. Co. of Baltimore, Md. Inc. v. Fahrney,* 132 Md. 222, 225, 103 A. 450 (1918). The insurer has the burden of proving that the insured's death was the result of suicide, and not by accident. *See Travelers Ins. Co. v. Connolly,* 145 Md. 554, 565, 125 A. 900 (1924)(stating that the burden is on the defendant insurance company to prove suicide); *Travellers' Ins. Co. v. Nicklas,* 88 Md. 470, 473, 41 A. 906 (1898)(stating that "[i]t is well settled ... that the presumption of law is against self-destruction, and this presumption will prevail in every case unless the facts disclosed are such as to be inconsistent with it.").

In the context of interpreting an insurance policy, the Court of Appeals has defined "accident" as: "a happening; an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect from a known cause, and therefore not expected." *Cole,* 359 Md. at 307, 753 A.2d 533 (quoting *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 151, 235 A.2d 556 (1967)). In *Cole,* the Court was faced with the question of whether a death resulting from an intentional tort may be considered an "accident" for purposes of accidental death

insurance coverage. *Id.* at 307, 753 A.2d 533 (noting that, from the victim's perspective, "her death may be said to have been the result of an accident if her murder occurred without her foresight or expectation."). Answering that question in the affirmative, the Court held that the determination of whether a death was accidental is made from the perspective of the insured. *Id.* at 315, 753 A.2d 533. In reaching its holding, the Court adopted a two-part test from *Lincoln Nat'l Life Ins. Co. v. Evans*, 943 F.Supp. 564 (D.Md.1996), to determine whether, from the insured's perspective, the death would have been considered " 'unforeseen, unusual and unexpected,' and therefore an 'accident.' " *Id.* (citing *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 652, 679 A.2d 540 (1996); *Harleysville*, 248 Md. at 151–52, 235 A.2d 556). The Court described the analysis to be undertaken as follows:

> The subjective part of the test entail[s] the court inquiring whether the insured expected an attack similar to the kind which occurred. If insufficient evidence exist[s] to determine that the insured actually expected to be attacked, then the court would advance to the second, objective inquiry. In this prong of the test, the court inquires whether a reasonable person with the same knowledge and experience as the insured would have viewed the injury as highly likely to occur in light of the insured's past conduct. If the answer to the objective question of the test [is] also negative, then the insured's death was the result of an "accident."

*Id.* at 314, 753 A.2d 533 (internal citations omitted)(citing *Lincoln Nat'l Life Ins. Co. v. Evans*, 943 F.Supp. 564, 568 (D.Md.1996)).

In the case before us, both parties urge that the trial court was incorrect in its finding that the term "suicide," as used in Art. 48A, § 416 and in the insurance policies, is ambiguous. We agree. As noted above, the suicide exclusion clause in the policies in question was permitted by § 416. According to principles of statutory construction, "[a] statute should be construed according to the ordinary and natural import of the language used without resorting to subtle or

forced interpretations for the purpose of limiting or extending its operation." *State Farm Mut. Auto. Ins. Co. v. Insurance Comm'r,* 283 Md. 663, 670, 392 A.2d 1114 (1978). Furthermore, "where statutory language is clear and unambiguous, according to its ordinary and commonly understood meaning, a court must so construe the statute, rather than resort to legislative history or other extraneous considerations to arrive at a contrary construction." *Total Audio–Visual Sys. v. DOL, Licensing & Regulation,* 360 Md. 387, 395, 758 A.2d 124 (2000)(internal citations omitted). Likewise, in determining the interpretation of an insurance contract, we must "give words their usual, ordinary, and accepted meaning ... the test for doing so is to determine 'what meaning a reasonably prudent layperson would attach to the term' ... [and in doing so] resort to dictionary definitions is [sic] appropriate." *Insurance Comm'r v. Mutual Life Ins. Co.,* 111 Md.App. 156, 185, 680 A.2d 584 (1996), *aff'd, Mutual Life Ins. Co. v. Insurance Comm'r,* 352 Md. 561, 723 A.2d 891 (1999)(quoting *Progressive Cas. Ins. Co. v. Dunn,* 106 Md.App. 520, 529, 665 A.2d 322 (1995)); *see also Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985). We will determine the meaning of the terms of a plain and unambiguous contract as a matter of law. *See Cole,* 359 Md. at 305, 753 A.2d 533; *Pacific Indem.,* 302 Md. at 389, 488 A.2d 486.

According to *Webster's Third New International Dictionary Unabridged* 2286 (1981), "suicide" means "the act or an instance of taking one's own life voluntarily and intentionally." Following an examination of other sources, we find that this definition appears to be an accurate representation of the usual and commonly accepted meaning of the term "suicide." *See Bigelow v. Berkshire Life Ins. Co.,* 93 U.S. 284, 287, 23 L.Ed. 918 (1876)(defining suicide as "the death of a party by his own voluntary act," and stating that the terms "shall commit suicide" and "die by his own hand" are synonymous); Md.Code (2000 Supp.), Article 27, § 416 (codifying the crime of "Assisted Suicide," and defining "suicide" as "the act or instance of intentionally taking one's own life."); 40A

Am.Jur.2d *Homicide* § 619 (1999) ("'[s]uicide' is the voluntary and intentional taking of one's own life by a sane person."); 83 C.J.S. *Suicide* § 1 (2000)(stating that "[i]n its technical and legal sense [suicide] means self-destruction by a sane person or the voluntary and intentional destruction of his own life by a person of sound mind."); *see also Knickerbocker Life Ins. Co. v. Peters,* 42 Md. 414, 417 (1875)(stating that "all the authorities concur in the view that an unintentional or accidental taking of life is not within the meaning and intention" of a suicide exclusion clause which makes a policy void if the insured "shall die by his own hand or act.").

We believe that the term "suicide" encompasses the instance in which an individual intends to end his or her own life and takes all of the necessary steps toward ending his or her life, with the exception of the final act. The accepted definition of suicide does not mandate that the decedent carry out the final act in order for his or her death to be considered suicide.[5] In addition, the word "instance," as included in the definition of suicide found both in Webster's dictionary and in Maryland's Assisted Suicide law, means "urgent or earnest solicitation," "instigation, suggestion, request," and "a step, stage, or situation viewed as part of a process or serious of events." *Webster's Third New International Dictionary Unabridged* 1171 (1981). This gives further support to the premise that "suicide" includes the scenario in which an individual, desiring to end his or her own life and taking steps to do so, actively solicits another person's assistance to carry out his or her death.

---

**5.** The phenomenon of "suicide by cop" recognizes that someone other than the deceased may commit the final act in a suicide. *See Hainze v. Richards,* 207 F.3d 795, 797 n. 1 (5th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 384, 148 L.Ed.2d 296 (2000)(discussing "suicide by cop," which refers to "an instance in which a person attempts to commit suicide by provoking the police to use deadly force."); *see also Medeiros v. O'Connell,* 150 F.3d 164, 167 n. 1 (2nd Cir.1998)(discussing suicide by cop); *Adams v. City of Fremont,* 68 Cal.App.4th 243, 250, 80 Cal.Rptr.2d 196 (1st Dist.1998)(same).

Appellees argue that Ms. Fister's death was not a suicide, because it was Mr. Goldman who fired the fatal shot. In effect, according to appellees' line of reasoning, the terms "homicide" and "suicide" are necessarily mutually exclusive, in that one who is shot by another cannot be deemed to have committed suicide. The cases appellees rely upon for that proposition, however, are criminal cases. In a criminal case, the focus of the court is on the conduct of the individual who shot the gun, in this case, Mr. Goldman. An insurance policy contest, however, is a civil case.

In *Cole*, which also involved an insurance policy contest, the Court held that, in determining whether the insured's death was the result of an accident, the events, constituting an intentional tort, are viewed from the perspective of the insured, who was also the victim of the intentional tort. 359 Md. at 315, 753 A.2d 533. Appellees argue that *Cole* is not applicable in this case, because the only reason that the Court looked to the perspective of the insured was because it found the word "accident" to be ambiguous, thus warranting further inquiry into the intention of the parties. In the instant case, according to appellee, the Court should not view the issue from the perspective of the insured because the word "suicide" is not ambiguous. We disagree with appellees' reading of *Cole*.

The *Cole* Court did not base its reasoning solely on the fact that the word accident was ambiguous. Rather, this was additional support provided by the Court after it had already adopted and employed the test set forth in *Lincoln Nat'l Life Ins*. *See id.* at 315, 753 A.2d 533 (stating further that "[t]he federal court's approach comports with Maryland law because it defines 'accident' from the point of view of the insured."). By determining that the victim's perspective would control the court's analysis of the events, the Court noted that it was adopting the rule of the majority of courts. *See id.* at 313, 753 A.2d 533; *see also* Ferdinand S. Tinio, Annotation, *Accident Insurance: Death or Injury Intentionally Inflicted by Another Due to Accident or Accidental Means*, 49 A.L.R.3d 673, 679 (1973 & 2000 Supp.)(stating that "[t]he rule seems to be

settled that although an insured is intentionally killed or injured by another person, the death or injury is deemed to have been caused by accident or through accidental means where it was neither foreseen, expected, not [sic] anticipated by the insured.").

The cases that the *Cole* Court relied upon when adopting and applying the two-part test were not based upon a finding of ambiguity in the word "accident." *See Lincoln Nat'l Life Ins.,* 943 F.Supp. 564 (1996); *Sheets,* 342 Md. at 652, 679 A.2d 540; *Harleysville,* 248 Md. at 151–52, 235 A.2d 556. Additionally, we note that although neither *Cole* nor *Linoln Nat'l Life Ins.* involved life insurance policies, *Cole* relied upon several cases involving life insurance policy contests for the proposition that the events should be viewed from the perspective of the insured. *See id.* at 316–17, 753 A.2d 533(citing *Roque v. Nationwide Mut. Ins. Co.,* 502 Pa. 615, 467 A.2d 1128, 1129 (1983); *Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 552 (Tex.1976); *Pfeifer v. World Serv. Life Ins. Co.,* 121 Wis.2d 567, 360 N.W.2d 65 (Ct.App.1984)). In all three of these cases, the result was not based upon a finding of ambiguity in the word "accident."

■ As discussed above, the *Cole* Court stated that an accident is "an event that takes place without one's foresight or expectation." 359 Md. at 307, 753 A.2d 533. Given the definition of "accident," it would be illogical to examine a death to determine if it was accidental from any perspective other than that of the insured/decedent. Courts must examine the death from the perspective of the insured, in order to determine whether the insured had the foresight or expectation of death. As previously discussed, we accept the common and ordinarily understood definition of "suicide," which is "an act or an instance of taking one's own life voluntarily and intentionally." Analogous to the determination of whether a death was an accident, the only logical way to determine whether a death was a suicide, *i.e.,* occurred pursuant to the insured's own free volition and intent, is from the perspective of the insured. Consistent with *Cole,* we hold that, as a matter of

law, we are required to consider whether Ms. Fister's death was the result of suicide from her perspective.

In the instant case, it is not disputed (1) that Ms. Fister had expressed her intention to commit suicide; (2) that she had attempted suicide several times; (3) that she purchased a gun with the purpose of using it to commit suicide; (4) that she tried to shoot herself but failed; and (5) that she voluntarily requested that Mr. Goldman pull the trigger of the gun that she had aimed at herself. Applying the *Cole* test to the aforementioned facts, qualifying this death as an "accident" or "unforseen, unusual and unexpected" from the perspective of Ms. Fister would be an absurd result, under either a subjective or an objective analysis. Applying that same two-part test to determine whether Ms. Fister's death was the result of a suicide leads us to the conclusion that her death was indeed a suicide, under either a subjective or an objective analysis. Ms. Fister voluntarily and intentionally took steps to end her life, and then implored her extraordinarily good friend to complete the final act.

Accordingly, we hold that, for purposes of her life insurance policies, Ms. Fister died as a result of suicide, and thus, her insurance policies fail. Based on this determination, we find it unnecessary to address appellant's arguments based upon agency principles and the slayer's rule.

**JUDGMENT IN FAVOR OF APPELLEES REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY WITH THE DIRECTION TO ENTER SUMMARY JUDGMENT IN FAVOR OF APPELLANT. COSTS TO BE PAID BY APPELLEES.**